BRYANT, Judge.
 

 Where the plain language of
 
 N.C. Gen. Stat. § 14-51.4
 
 (1) does not require a causal nexus between the disqualifying felony and the circumstances giving rise to the perceived need for the use of force, we find no error. Where defendant stipulated to a disqualifying felony before the charge conference, the trial court did not commit prejudicial error in giving a self-defense jury instruction. Where the facts of this specific case do not show that defendant was prejudiced by the trial court's limiting of the scope of defendant's questioning of prospective jurors during
 
 voir dire
 
 , we find no prejudicial error but express our concern that the trial court flatly prohibited questioning as to issues of race and implicit bias during
 
 voir dire
 
 . Where defendant opened the door to certain evidence, the trial court did not err in denying defendant's motion in limine and allowing the State to introduce rebuttal evidence. We find no prejudicial error in the judgments of the trial court.
 

 Around 3:00 a.m. on 24 September 2013, defendant Ramar Crump and Jamel Lewis gained entrance to an illegal gambling house on Old Pineville Road in Mecklenburg County, North Carolina and held about a dozen patrons at gunpoint. Both defendant and Lewis had firearms. One by one, defendant and Lewis had the patrons hand over their valuables, including wallets, cell phones, identification cards, credit cards, debit cards, and cash. They also had each patron, except for a woman and a man with a bad leg, strip down to his underwear, and then marched them all into the men's restroom and barricaded them in while defendant and Lewis escaped.
 

 When smoke began to seep under the bathroom door, two people, including Matios ("Mat") Tegegne, went up through the false ceiling into the kitchen and let everyone out. The "smoke" had come from a fire extinguisher that had been sprayed around the room. Everyone's clothes and belongings were gone. With a cell phone provided by a passerby, calls were made requesting clothes and spare car keys or rides home. No one reported the robbery to the police.
 

 Gary Smith, whose daughter had attended the poker game on Old Pineville Road on the night of the robbery, also knew Mat. Mat had his phone stolen during the robbery, but had purposefully not deactivated his phone in order to track it. Smith told Mat he had been receiving text messages from Mat's phone from people he believed to be the robbers who were looking for another poker game to rob. Smith told Mat he intended to invite them to a "fake poker game and report them, call the cops."
 

 In the early morning hours of 29 September 2013, Smith received a response from
 
 *418
 
 Mat's phone to a group text he sent earlier about the location of a new, but nonexistent, poker game on North Tryon Road (the "bait game"). When Smith arrived at the bait game located at a mixed-use office and commercial building on North Tryon Street, he looked for a Silver Mustang, intending to confront the passenger whom he believed to be in possession of Mat's phone. However, as he approached the Mustang, he saw through the open window that the driver had a handgun.
 

 Smith parked across the street in the Amtrak station lot, called 911, and told the emergency operator "there were two gentlemen in a car with loaded guns, and I thought they were intending to rob someone." From the Amtrak lot, Smith watched police cars arrive. Then, he heard gunshots. First, he heard what sounded like handgun fire, then he heard what sounded like shotgun and large-caliber handgun fire. He then watched the Mustang "screech" out of the lot. Smith walked across the street and told police officers he made the 911 call.
 

 A police car with lights and sirens activated pursued the Mustang down Tryon Street. The owner and driver of the car was defendant. Lewis was in the back seat and another passenger was in the front seat. After a low-speed pursuit which continued for some distance, the Mustang ran over stop sticks that had been placed by police and came to a stop. All three men got out of the car and were taken into custody.
 

 After the occupants of the car were placed under arrest, officers searched the Mustang. Both right side tires were missing, the passenger side window was shattered, and there was a series of bullet holes along the passenger side of the car. Officers found a six-shot .38-caliber revolver in the driver's seat with six spent shells in the chambers. Officers also found credit cards and the identification cards of several poker players who had been robbed. In the trunk of the car, officers found three firearms. They also found four cell phones and mail addressed to defendant. Victims of the 24 September robbery on Old Pineville road identified wallets, credit cards, and debit cards found in the Mustang as their own.
 

 On 7 October 2013, the Mecklenburg County Grand Jury indicted defendant on five offenses committed on 29 September 2013: two counts of assault with a deadly weapon with the intent to kill ("AWDWIK"), two counts of assault on a government official with a firearm, and possession of a firearm by a convicted felon. On 28 October 2013, the grand jury indicted defendant on twenty-four offenses committed during the poker game robbery on 24 September 2013: eleven counts of armed robbery and eleven counts of second-degree kidnapping, conspiring with Lewis to commit armed robbery, and possession of a firearm by a convicted felon. All charges were joined for trial.
 

 The case came on for trial at the 16 May 2016 Criminal Term of the Mecklenburg County Superior Court, the Honorable Gregory Hayes, Judge presiding. At the close of the State's evidence, the trial court dismissed the charges of armed robbery and second-degree kidnapping as to one victim as well as the charge of armed robbery as to another victim.
 

 On 7 June 2016, the jury found defendant not guilty of two counts of assaulting a law enforcement officer with a firearm and guilty of all the remaining charges.
 

 _________________________
 

 On appeal, defendant contends the trial court erred (I) in overruling his objections to the instruction on self-defense which barred defendant from claiming self-defense in circumstances where it was legally available; (II) by misapprehending the nature of the "stake-out" questions, thereby depriving defendant of his right to elicit information during
 
 voir dire
 
 relevant to the exercise of cause and peremptory challenges; and (III) by permitting the State to present evidence that the investigation of certain officers by homicide detectives and internal affairs agents resulted in no disciplinary actions or demotions for those officers.
 

 I
 

 Defendant first argues the trial court erred in overruling his objections to the self-defense instructions and in rejecting defendant's
 
 *419
 
 proposed language. Specifically, defendant argues the language of the instruction, as a whole, had the legal effect of negating the defense of self-defense entirely, and the error was so prejudicial that he is entitled to a new trial. We disagree.
 

 "Whether a jury instruction correctly explains the law is a question of law, reviewable by this Court
 
 de novo
 
 ."
 
 State v. Barron
 
 ,
 
 202 N.C. App. 686
 
 , 694,
 
 690 S.E.2d 22
 
 , 29 (2010) (citing
 
 Staton v. Brame
 
 ,
 
 136 N.C. App. 170
 
 , 174,
 
 523 S.E.2d 424
 
 , 427 (1999) ). "However, an error in jury instructions is prejudicial and requires a new trial only if 'there is a reasonable possibility that, had the error in question not been committed, a different result would have been reached at the trial out of which the appeal arises.' "
 
 State v. Castaneda
 
 ,
 
 196 N.C. App. 109
 
 , 116,
 
 674 S.E.2d 707
 
 , 712 (2009) (citation omitted) (quoting N.C. Gen. Stat. § 15A-1443(a) (2007) ).
 

 In the instant case, defendant raised the statutory justifications of protection of his motor vehicle and self-defense pursuant to
 
 N.C. Gen. Stat. §§ 14-51.2
 
 , -51.3 as to the AWDWIK charge. The trial court found that defendant's evidence, on the other hand, did not show his belief that entry to his motor vehicle was imminent, and gave N.C.P.I.-Crim. 308.45 ("All assaults involving deadly force") and not N.C.P.I.-Crim. 308.80 ("defense of motor vehicle"), as requested by defendant. The trial court instructed the jury pursuant to N.C.P.I.-Crim. 308.45 by incorporating the language of
 
 N.C. Gen. Stat. § 14-51.4
 
 (1), which indicates self-defense based on .1 and .2 is not available "to a person ... who was attempting to commit, was committing, or was escaping after the commission of a felony."
 
 See
 

 N.C. Gen. Stat. § 14-51.4
 
 (1) (2017).
 

 The State requested that the trial court also define for the jury those felonies which would disqualify defendant's claim of self-defense, arguing there was ample evidence of defendant's uncharged felonious conduct, including,
 
 inter alia
 
 , the fact that defendant and his accomplices used a stolen cell phone to ascertain the location of a poker game to rob. The trial court agreed and instructed the jury in the words of N.C.G.S. § 14-51.4(1) that self-defense was not available to one engaged in felonious conduct:
 

 Self-defense is also not available to a person who used offensive force and who was attempting to commit, was committing, or was escaping after the commission of a felony. Robbery with a dangerous weapon, attempted robbery with a dangerous weapon, conspiracy to commit robbery with a dangerous weapon, possession of stolen goods, assault with a deadly weapon with intent to kill, and assault with a firearm on a law enforcement officer are felonies.
 

 Per defendant's request, the trial court also instructed the jury according to N.C.P.I.-Crim. 38.10 and instructed that if defendant was not the aggressor and was in his motor vehicle at a place where he had the lawful right to be, he was under no obligation to retreat and could stand his ground and repel force with force, regardless of the character of the assault being made upon him.
 

 Defendant makes two challenges relevant to the instruction the trial court gave. First, (1) defendant argues that N.C.G.S. § 14-51.4(1) requires both a temporal and causal nexus between the disqualifying felony and the circumstances which gave rise to the perceived need to use defensive force. He contends that the jury should have been instructed that commission of a felony only disqualifies self-defense when a defendant's "felonious acts directly and immediately caused the confrontation that resulted in the deadly threat to him."
 
 [1]
 
 Thus, defendant argues, the trial court erred by omitting the purported "causal nexus requirement" from the instruction. Second, (2) defendant contends the inclusion of AWDWIK as a qualifying felony was circular in nature and, therefore, erroneous.
 

 *420
 
 1.
 
 "Causal Nexus Requirement"
 

 Section 14-51.4 ("Justification for defensive force not available") states as follows: "The justification described in G.S. 14-51.2 and G.S. 14-51.3 [ (self-defense) ] is not available to a person who used defensive force and who: (1) Was attempting to commit, committing, or escaping after the commission of a felony." N.C.G.S. § 14-51.4(1). Furthermore, the presumption of objective reasonableness of the need to use defensive force established in
 
 N.C. Gen. Stat. § 14-51.2
 
 (b) does not apply when the person using force in defense of their home, workplace, or motor vehicle was "engaged in, attempting to escape from, or using the ... motor vehicle ... to further any criminal offense that involves the use or threat of physical force or violence against any individual."
 
 N.C. Gen. Stat. § 14-51.2
 
 (c)(3) (2017). In other words, self-defense is not available to one who uses defensive force when contemporaneously engaged in felonious conduct.
 
 See
 
 id.
 

 Defendant argues that N.C.G.S. § 14-51.4(1) requires both a temporal and a causal nexus between the use of defensive force and felonious activity in order for that defensive force to be "disqualified" as self-defense. In other words, defendant argues the disqualifying felony must have "directly and immediately produced the confrontation where the force was used." We agree with defendant that N.C.G.S. § 14-51.4(1) contains a temporal requirement but disagree that it contains a causal nexus one.
 

 "It is well established that this Court's principal aim when interpreting statutes is to effectuate the purpose of the legislature in enacting the statute, and that statutory interpretation properly begins with an examination of the plain words of the statute."
 
 State v. Mylett
 
 , --- N.C. App. ----, ----,
 
 799 S.E.2d 419
 
 , 425 (2017) (quoting
 
 State v. Williams
 
 ,
 
 232 N.C. App. 152
 
 , 158,
 
 754 S.E.2d 418
 
 , 423 (2014) ). "If the language of a statute is free from ambiguity and expresses a single, definite, and sensible meaning, judicial interpretation is unnecessary and the plain meaning of the statute controls."
 
 State v. Holloman
 
 ,
 
 369 N.C. 615
 
 , 628,
 
 799 S.E.2d 824
 
 , 832-33 (2017) (quoting
 
 Mazda Motors of Am., Inc. v. Sw. Motors, Inc.
 
 ,
 
 296 N.C. 357
 
 , 361,
 
 250 S.E.2d 250
 
 , 253 (1979) ).
 

 Section 14-51.4 plainly states that the defense of self-defense "is not available to a person who used defensive force and who: (1) Was attempting to commit, committing, or escaping after the commission of a felony." N.C.G.S. § 14-51.4(1). The plain language of this statutory provision makes clear that the disqualifying felony need not precipitate the circumstances giving rise to the perceived need to use force; there is no qualifying or limiting language in this provision modifying the word "felony." For example, section 14-51.2(c)(3), which denies the presumption of reasonableness of the perceived need to use defensive force to safeguard one's home, workplace, or vehicle to one using that place "to further any criminal offense
 
 that involves the use of threat of physical force or violence
 
 against any individual." N.C.G.S. § 14-51.2(c)(3) (emphasis added). Notably, section 14-51.4(1) does
 
 not
 
 state that self-defense is unavailable to a person who "[w]as attempting to commit, committing, or escaping after the commission of a felony"
 
 that involves the use of threat of physical force or violence
 
 . Thus, the plain language of section 14-51.2(c)(3) makes clear that the General Assembly knew how to explicitly articulate a causal nexus between the commission of a felony and circumstances attendant to the perceived need of the use of force and deliberately chose not to articulate a similar causal nexus in section 14-51.4(1).
 
 See also
 
 ,
 
 e.g.
 
 ,
 
 N.C. Gen. Stat. § 14-17
 
 (a) (2017) (defining felony murder as any murder "committed in the perpetration or attempted perpetration" of certain defined felonies).
 

 Accordingly, the absence of a plain and explicit causal nexus enunciated in section 14-51.4(1) makes manifest that the General Assembly omitted it purposefully and intended to limit the invocation of self-defense in this instance solely to the law-abiding. We decline to impose a causal nexus requirement and frustrate legislative intent. Defendant's argument is overruled.
 

 2.
 
 AWDWIK as Qualifying Felony
 

 Defendant argues the inclusion and identification of AWDWIK as a disqualifying felony is circular, triggering both the consideration
 
 *421
 
 and disqualification of his self-defense claim and thereby negating it. The State concedes-and we agree-that including the AWDWIK felony was a "circularity error," but we conclude that it was not prejudicial error.
 

 Here, the State charged that on 29 September 2013, defendant was a convicted felon who possessed a firearm in violation of
 
 N.C. Gen. Stat. § 14-415.1
 
 . Defendant testified that on 29 September 2013, he possessed and discharged a firearm, and he stipulated that he was a convicted felon at the time. Thus, defendant admitted to a disqualifying felony in advance of the charge conference, and therefore, he was not entitled to a self-defense instruction pursuant to
 
 N.C. Gen. Stat. § 14-51.4
 
 (1)
 
 in any event
 
 .
 
 See supra
 
 § I.1.
 

 It has long been recognized that
 

 [w]hen a trial court undertakes to instruct the jury on self-defense in a case in which no instruction in this regard is required, the gratuitous instructions on self-defense are error favorable to [the] defendant. As [the] defendant was not entitled to any jury instructions on self-defense, any mistakes by the trial court in its instructions on self-defense were, at worst, harmless error not necessitating a new trial.
 

 State v. Reid
 
 ,
 
 335 N.C. 647
 
 , 672,
 
 440 S.E.2d 776
 
 , 790 (1994) (citing
 
 State v. Bush
 
 ,
 
 307 N.C. 152
 
 , 161,
 
 297 S.E.2d 563
 
 (1982) ). In the instant case, at best, the contested instruction benefited defendant by permitting the jury to consider whether he had no duty to retreat and was entitled to stand his ground. At worst, the contested instruction was harmless error and was not prejudicial to defendant.
 

 First, the instructions plainly identified disqualifying felonies of which there was sufficient evidence-i.e., possession of a firearm by a felon (to which defendant stipulated before the charge conference) and assault with a deadly weapon on a law enforcement officer. Second, the State did not argue that AWDWIK was a disqualifying felony, focusing on defendant's felony possession of a firearm and stolen goods and assault on a law enforcement officer. Accordingly, any error by the trial court in including the AWDWIK charge as a disqualifying felony was not prejudicial to defendant where there is no reasonable possibility that, had the error not been committed, a different result would have been reached at trial. Defendant's argument is overruled.
 

 II
 

 Defendant next argues that the trial court's misapprehension of the nature of "stake-out" questions deprived him of his right to elicit information during
 
 voir dire
 
 relevant to the exercise of cause and peremptory challenges. Specifically, defendant challenges the trial court's decision disallowing any inquiry into the opinions of potential jurors regarding an unrelated and high-profile case involving a shooting by a police officer that resulted in a man's death wherein the officer was not ultimately convicted. Defendant contends these were not "stake-out" questions-questions which essentially ask jurors how they would vote in this case-and were properly a subject of inquiry during
 
 voir dire
 
 . We disagree based on the specific facts of this case, but nevertheless caution trial courts to consider "the importance of acknowledging issues of race and bias in voir dire." Patrick C. Brayer,
 
 Hidden Racial Bias: Why We Need to Talk with Jurors About Ferguson
 
 ,
 
 109 Nw. U.L. Rev. 163
 
 , 169 (2015).
 

 The State contends that we need not consider this issue at all because defendant failed to exhaust his peremptory challenges, which failure forestalls his ability to demonstrate prejudice from the trial court's ruling. For the following reasons, we also disagree with the State's argument that a defendant must exhaust all of his peremptory challenges as a threshold for review of this issue on appeal.
 

 A.
 
 Failure to Exhaust Peremptory Challenges
 

 "The purpose of
 
 voir dire
 
 is to ensure an impartial jury to hear defendant's trial."
 
 State v. Gregory
 
 ,
 
 340 N.C. 365
 
 , 388,
 
 459 S.E.2d 638
 
 , 651 (1995) (citing
 
 State v. Bracey
 
 ,
 
 303 N.C. 112
 
 , 119,
 
 277 S.E.2d 390
 
 , 394 (1981) ). In other words, "[t]he purpose of jury
 
 voir dire
 
 is to 'eliminate extremes of
 
 *422
 
 partiality and ensure that the jury's decision is based solely on the evidence presented at trial.' "
 
 Haarhuis v. Cheek
 
 , --- N.C. App. ----, ----,
 
 805 S.E.2d 720
 
 , 725 (2017) (quoting
 
 State v. White
 
 ,
 
 340 N.C. 264
 
 , 280,
 
 457 S.E.2d 841
 
 , 850 (1995) ). "The
 
 voir dire
 
 of prospective jurors serves a two-fold purpose: (i) to determine whether a basis for challenge for cause exists, and (ii) to enable counsel to
 
 intelligently
 
 exercise peremptory challenges."
 
 Gregory
 
 , 340 N.C. at 388,
 
 459 S.E.2d at 651
 
 (emphasis added) (citing
 
 State v. Soyars
 
 ,
 
 332 N.C. 47
 
 , 56,
 
 418 S.E.2d 480
 
 , 486 (1992) ).
 

 Nevertheless, "[t]he trial court has broad discretion to ensure that a competent, fair, and impartial jury is impaneled."
 

 Id.
 

 (citation omitted). As such, "[r]egulation of the form of
 
 voir dire
 
 questions is vested within the sound discretion of the trial court...."
 
 State v. Chapman
 
 ,
 
 359 N.C. 328
 
 , 346,
 
 611 S.E.2d 794
 
 , 810 (2005).
 

 The State argues that "[d]efendant did not exhaust his peremptory challenges and left one of his original six challenges unused[,] ... he did not show his dissatisfaction with the jury, [and] he can never demonstrate prejudice, such that this Court need not consider this issue and ought to deny [d]efendant relief." However, by arguing that exhausting peremptory challenges is the threshold a defendant must cross in order to establish prejudice during voir dire and thus be entitled to review of this issue on appeal, the State's argument ignores the crucial difference between challenges for cause and peremptory challenges in impaneling a jury: the former is a challenge based on the views a juror has expressed
 
 in open court
 
 in response to lawyers' questions and which would "substantially impair the performance of his duties" as a juror and is ruled on by the trial court,
 
 see
 

 State v. Cummings
 
 ,
 
 361 N.C. 438
 
 , 447,
 
 648 S.E.2d 788
 
 , 794 (2007) (quoting
 
 Wainwright v. Witt
 
 ,
 
 469 U.S. 412
 
 , 424,
 
 105 S.Ct. 844
 
 , 852,
 
 83 L.Ed.2d 841
 
 , 851 (1985) ); the latter is often a seemingly arbitrary exercise, it may be made for almost any reason at all (
 
 but see
 

 Batson v. Kentucky
 
 ,
 
 476 U.S. 79
 
 , 89,
 
 106 S.Ct. 1712
 
 , 1719,
 
 90 L.Ed.2d 69
 
 , 83 (1986) (determining that the use of peremptory challenges for a racially discriminatory purpose is unconstitutional) ) and is not (usually,
 
 see
 

 id.
 

 at 96-98
 
 ,
 
 106 S.Ct. at 1723-24
 
 ,
 
 90 L.Ed.2d at
 
 88-89 ) inquired into by the trial court.
 

 In other words, the requirement that a defendant exhaust his peremptory challenges is a meaningless exercise where, as here, a defendant has been precluded from inquiring into jurors' potential biases on a relevant subject, leaving the defendant to assume or guess about those biases without being permitted to probe deeper; this requirement elevates form over function in that the exhaustion of peremptory challenges in a case like this does nothing to ameliorate defendant's dissatisfaction with the venire. As a result, any peremptory challenge made by a defendant (or any party) is an empty gesture once a trial court has ruled that an entire line of (relevant) questioning will be categorically prohibited.
 

 For the foregoing reasons, we disagree with the State's argument that a failure to exercise all peremptory challenges categorically bars a defendant from showing prejudice on appeal. Instead, we are guided by the broader principle that the purpose of
 
 voir dire
 
 is "(i) to determine whether a basis for challenge for cause exists, and (ii) to enable counsel to
 
 intelligently
 
 exercise peremptory challenges."
 
 Gregory
 
 , 340 N.C. at 388,
 
 459 S.E.2d at 651
 
 (emphasis added) (citing
 
 Soyars
 
 ,
 
 332 N.C. at 56
 
 ,
 
 418 S.E.2d at
 
 486 ). Accordingly, we review defendant's argument on appeal.
 

 B.
 
 "Stake-Out" Questions
 

 Defendant challenges the trial court's ruling prohibiting any inquiry into the opinions of potential jurors regarding an unrelated and high-profile case involving a police officer shooting that resulted in a man's death and wherein the officer was not ultimately convicted. Defendant also challenges the trial court's prohibition on his line of questioning regarding the specific police officer shooting mentioned above and on police officer shootings in general as based on a misapprehension of his questions as "stake-out" questions. On the very specific facts of this case, we disagree and conclude that defendant was
 
 *423
 
 not prejudiced by the rulings of the trial court.
 

 "On appeal, we review the entire record of
 
 voir dire
 
 to determine 'whether the trial court abused its discretion and whether that abuse resulted in harmful prejudice to the defendant.' "
 
 Haarhuis
 
 , --- N.C. App. at ----,
 
 805 S.E.2d at 725
 
 (quoting
 
 State v. Cheek
 
 ,
 
 351 N.C. 48
 
 , 66,
 
 520 S.E.2d 545
 
 , 556 (1999) ).
 

 "Hypothetical questions that seek to indoctrinate jurors regarding potential issues before the evidence has been introduced and before jurors have been instructed on applicable principles of law are ... impermissible."
 
 State v. Jones
 
 ,
 
 347 N.C. 193
 
 , 203,
 
 491 S.E.2d 641
 
 , 647 (1997) (citing
 
 State v. Parks
 
 ,
 
 324 N.C. 420
 
 , 423,
 
 378 S.E.2d 785
 
 , 787 (1989) ).
 

 On the
 
 voir dire
 
 ... of prospective jurors, hypothetical questions so phrased as to be ambiguous and confusing or containing incorrect or inadequate statements of the law are improper and should not be allowed. Counsel may not pose hypothetical questions designed to elicit in advance what the juror's decision will be under a certain state of the evidence or upon a given state of facts. In the first place, such questions are confusing to the average juror who at that stage of the trial has heard no evidence and has not been instructed on the applicable law. More importantly, such questions tend to "stake out" the juror and cause him to pledge himself to a future course of action. This the law neither contemplates nor permits. The court should not permit counsel to question prospective jurors as to the kind of verdict they would render, or how they would be inclined to vote, under a given state of facts.
 

 Id.
 

 (citations omitted) (alteration in original) (quoting
 
 State v. Vinson
 
 ,
 
 287 N.C. 326
 
 , 336,
 
 215 S.E.2d 60
 
 , 68 (1975),
 
 death sentence vacated
 
 ,
 
 428 U.S. 902
 
 ,
 
 96 S.Ct. 3204
 
 ,
 
 49 L.Ed.2d 1206
 
 (1976) ).
 

 In
 
 Haarhuis
 
 , a wrongful death case involving a car accident where the defendant was intoxicated, the defendant challenged on appeal the "[p]laintiff's questioning of potential jurors during
 
 voir dire
 
 regarding their general attitudes about alcohol and drunk driving." --- N.C. App. at ----,
 
 805 S.E.2d at 724
 
 . This Court concluded that the plaintiff "had the right to question potential jurors regarding their
 
 general
 
 attitudes about alcohol and drunk driving in order to determine 'whether a basis for challenge for cause exist[ed]' and to allow both parties to 'intelligently exercise [their] peremptory challenges.' "
 

 Id.
 

 at ----,
 
 805 S.E.2d at 725
 
 (alterations in original) (quoting
 
 Gregory
 
 , 340 N.C. at 388,
 
 459 S.E.2d at
 
 651 ). Notably, this line of questioning was permitted (and affirmed on appeal) even though the parties had decided prior to trial "that no questions would be asked which tended to tie [the] [d]efendant to alcohol, but that [the] [p]laintiff could ask about alcohol-related issues so long as it was not too suggestive."
 

 Id.
 

 at ----,
 
 805 S.E.2d at 726
 
 .
 

 In the instant case, defendant was categorically denied the opportunity to question prospective jurors not only about a specific police officer shooting, but also even
 
 generally
 
 about their opinions and/or biases regarding police officer shootings of (specifically) black men in a case where defendant was a black male and police officers were involved in the shooting at issue. First, the trial court sustained the State's objection to a line of questioning by defendant regarding a specific incident of police violence (the police officer shooting death of Jonathan Ferrell):
 

 [Defense counsel]: Now, something else I want to talk about. This one is a difficult one. It's called implicit bias.
 
 [
 

 2
 

 ]
 
 It's the concept that race is so ingrained in our culture that there's an implicit bias against people of a particular race, specifically African Americans, that people experience. What I'm going to do is I'm going to ask a couple of pointed questions of you all about that. So I'll start with you, [Ms. Harris
 
 [3]
 
 ]. When
 
 *424
 
 you hear the statement the only black man charged with robbery, what's the first thing that pops into your head?
 

 [The State]: Objection.
 

 THE COURT: Sustained.
 

 ....
 

 [Defense counsel]: There have been some cases in the recent history of this country dealing with this issue, specifically as to some African-American men and police officers is the first thing that comes to mind. Additionally I expect there to be testimony regarding the Jonathan Ferrell case and what effect that impact-that case had on [defendant's] mindset. Is anyone familiar with the Jonathan Ferrell case that happened here in Charlotte approximately September of 2013?
 

 In sustaining the State's objection to this line of questioning, the trial court said it was "not going to get into an extraneous case that happened in Charlotte during jury selection...." Then, when defense counsel asked if he could "generally as to incidents ... inquire of the jury if they have opinions related to incidents of cops firing on civilians that happened in the past couple years," the trial court responded that it thought that was "another stake-out question."
 

 On the specific facts of the instant case, we believe the trial court's rulings were not ultimately prejudicial to defendant. This is because the evidence presented at trial showed the following.
 

 Per defendant's own testimony, it was not until the car chase ensued that he was even aware the individuals he fired on were police officers. Defendant, who was driving the Mustang on the night in question, testified that he saw "a figure" in "black clothing" with "a gun aimed at [him]." Then he felt an "impact on [the] door, on the passenger door," which he took to be a gunshot, and he fired shots from his .38 towards the "figure" in order to have time to turn the car on and drive away. It was not until defendant drove the car onto North Tryon Street that he saw police lights flashing and realized he had been shooting at police officers. It was at this point that defendant testified he began to think he "might not make it out of this one[,]" as a result of being involved in a shootout with the police.
 

 In another case-not this one-but in another case involving a black male defendant involved in a shooting with police officers, a line of questioning akin to the one proposed by this defendant at trial regarding police officer shootings could very well be a proper-even necessary-subject of inquiry as part of the jury
 
 voir dire
 
 , and the trial court should seriously consider allowing counsel to pursue this type of questioning in order to allow both parties-the State and defendant-"to 'intelligently exercise [their] peremptory challenges.' "
 
 See
 

 Haarhuis
 
 , --- N.C. App. at ----,
 
 805 S.E.2d at 725
 
 (alteration in original) (quoting
 
 Gregory
 
 , 340 N.C. at 388,
 
 459 S.E.2d at
 
 651 );
 
 see also
 
 Peter A. Joy,
 
 Race Matters in Jury Selection
 
 , 109 Nw. U.L. Rev. Online 180, 186 (2015) ("Especially in times when issues of race are on the minds of potential jurors, such as currently in the St. Louis area due to the shooting of Michael Brown and continuing protests in Ferguson and several other cities over racial injustices, failing to question about bias in some cases may result in stacking the jury against the accused."); Cynthia Lee,
 
 A New Approach to Voir Dire on Racial Bias
 
 , 5 U.C. Irvine L. Rev. 843, 846 (2015). Indeed, we believe that "[a]s long as [a] defense attorney can tie these [types of] questions to an issue in the case, the court should permit the questioning."
 
 See
 
 Joy,
 
 Race Matteres in Jury Selection
 
 , 109 Nw. U.L. Rev. at 185. However, on the precise facts of this case, we find no prejudicial error.
 

 III
 

 Lastly, defendant contends the trial court erred by permitting the State to present evidence that the internal CMPD investigation of officers involved in the case resulted in no disciplinary actions or demotions. Specifically, defendant contends that the results of this kind of investigation constitute hearsay, and no hearsay exception permits these results to have been admitted when offered by the State at trial in a criminal case. We disagree.
 

 "The trial court's determination as to whether an out-of-court statement constitutes
 
 *425
 
 hearsay is reviewed de novo on appeal."
 
 State v. Castaneda
 
 ,
 
 215 N.C. App. 144
 
 , 147,
 
 715 S.E.2d 290
 
 , 293 (2011) (citation omitted). "When preserved by an objection, a trial court's decision with regard to the admission of evidence alleged to be hearsay is reviewed
 
 de novo
 
 ."
 
 State v. Johnson
 
 ,
 
 209 N.C. App. 682
 
 , 692,
 
 706 S.E.2d 790
 
 , 797 (2011) (citation omitted).
 

 However, "[t]he basis for the rule commonly referred to as 'opening the door' is that when a defendant in a criminal case offers evidence which raises an inference favorable to his case, the State has the right to explore, explain or rebut that evidence."
 
 State v. Brown
 
 ,
 
 310 N.C. 563
 
 , 571,
 
 313 S.E.2d 585
 
 , 590 (1984) (citation omitted).
 

 In the instant case, defendant filed a pretrial motion in limine to preclude the State from introducing evidence that an internal CMPD investigation of two officers-Holzhauer and Sussman, who responded to Gary Smith's 911 call and engaged in a shootout with defendant at North Tryon Street on 29 September 2013-did not result in disciplinary action. During the hearings on defendant's motion, the State explained it sought to introduce evidence only of the fact that an investigation had been conducted and no disciplinary action had been taken. Defendant, however, noted his intent to open the door during cross-examination and question the officers about their knowledge of the inner workings of such investigations, and whether they had conferred with an attorney prior to making their official statements. The trial court noted that defendant's proposed line of questioning was opening the door to the State's introduction of the results of the investigation and even afforded defendant the opportunity to close it. However, defendant maintained his intent to proceed with his proposed line of questioning, and the trial court denied his motion in limine.
 

 During the State's direct examination of the officers, it elicited testimony only to the extent that a post-shooting internal investigation had taken place and no disciplinary action had resulted. The State did not call any internal investigators to testify about the propriety of the officers' conduct, and the State also addressed some of the issues defendant proposed to raise during the pretrial conferences. The State explained it did not want to appear to the jury as if it had suppressed the internal investigation. Defendant then cross-examined both officers about their knowledge of the inner workings of internal investigations, their pre-statement attorney communications, and Officer Holzhauer's pre-statement trip to the hospital for his panic attack sustained after the shooting.
 

 Here, defendant indicated his intent to explore the circumstances under which the officers might have altered their official statements and testimony as to who fired the first shot in an attempt to avoid CMPD disciplinary action. Fundamental fairness dictates that the State be allowed to establish that no discipline was imposed so as not to appear as if it were suppressing the investigation or its results. Accordingly, where defendant established his intent to open the door to the State's evidence that no disciplinary action resulted against Officers Holzhauer and Sussman, the trial court did not err in denying defendant's motion in limine and in ruling that the State would be allowed to present such evidence, given defendant's stalwart intention to open the door thereto.
 
 See
 

 Brown
 
 ,
 
 310 N.C. at 571
 
 ,
 
 313 S.E.2d at 590
 
 (citation omitted). Defendant's argument is overruled.
 

 NO PREJUDICIAL ERROR.
 

 Judges DILLON and DIETZ concur.
 

 [1]
 

 Indeed, before trial, defendant requested in writing that the self-defense instruction include the language from N.C.G.S. § 14-51.4(1) and that the jury be instructed on the felonies of possession of a firearm by a felon and possession of stolen goods. At trial, defendant argued that the felony of possession of a firearm by a convicted felon was the sole disqualifying felony on which the jury should be instructed. At that point at trial, defendant had admitted to his possession and discharge of a firearm, and had stipulated that he had a prior felony conviction.
 

 [2]
 

 See
 
 Cynthia Lee,
 
 A New Approach to Voir Dire on Racial Bias
 
 , 5 U.C. Irvine L. Rev . 843, 846 (2015) ("Calling attention to implicit racial bias can encourage jurors to view the evidence without the usual preconceptions and automatic associations involving race that most of us make.").
 

 [3]
 

 A pseudonym has been used for this prospective juror.