IN THE SUPREME COURT OF NORTH CAROLINA

No. 151PA18

Filed 18 December 2020

STATE OF NORTH CAROLINA

v.

RAMAR DION BENJAMIN CRUMP

On discretionary review pursuant to N.C.G.S. § 7A-31 of a unanimous decision of the Court of Appeals, 259 N.C. App. 144, 815 S.E.2d 415 (2018), finding no error after appeal from judgments entered on 7 June 2016 by Judge Gregory R. Hayes in Superior Court, Mecklenburg County. Heard in the Supreme Court on 12 October 2020.

*Joshua H. Stein, Attorney General, by Mary Carla Babb, Assistant Attorney General, for the State-appellee.*

*Ann B. Petersen for defendant-appellant.*

EARLS, Justice.

This case requires us to determine whether the Court of Appeals erred by finding no error in the judgments arising from an incident involving a black male defendant who exchanged gunshots with two officers from the Charlotte-Mecklenburg Police Department. Without deciding whether or not the trial court abused its discretion when it "flatly prohibited questioning as to issues of race and implicit bias during *voir dire*," *State v. Crump*, 259 N.C. App. 144, 145, 815 S.E.2d

415, 417 (2018), and "categorically denied [defendant] the opportunity to question prospective jurors not only about a specific police officer shooting, but also even *generally* about their opinions and/or biases regarding police officer shootings of (specifically) black men," *id.* at 155, 815 S.E.2d at 423, the Court of Appeals held that "[o]n the specific facts of the instant case . . . the trial court's rulings were not ultimately prejudicial to defendant," *id.* at 156, 815 S.E.2d at 424. We conclude that the trial court did abuse its discretion and that the trial court's improper restrictions on defendant's questioning during voir dire did prejudice defendant. Accordingly, we reverse.

## Background

At around 3:00 a.m. on 24 September 2013, two black men gained entry to an office suite where about a dozen people were participating in an underground poker game. Both men were armed. The men forced most of the poker players to undress and barricaded them in a restroom. The men then proceeded to ransack the office suite and steal the poker players' clothing, wallets, cell phones, personal identification cards, credit cards, debit cards, and cash.

A few days later, one of the organizers of the underground poker game, Gary Smith, devised a plan to identify the robbers. He knew that one of the robbery victims, Matios Tegegne, had not cancelled the service for his stolen cell phone, hoping to track its location. Smith sent a text message to a group that included Tegegne providing fake information about an upcoming poker game. When someone responded to

Smith's text message from Tegegne's cell phone number, Smith provided that person with details of an invented poker game (the "bait game") at a mixed-use office and commercial building at 1801 N. Tryon Street in Charlotte. Smith planned to confront the person using the victim's cell phone—ostensibly, one of the perpetrators of the 24 September 2013 robbery—if and when he arrived at the bait game.

Early on the morning of 29 September 2013, three black males—Jamel Lewis, Warren Lewis, and defendant Ramar Crump—arrived at 1801 N. Tryon Street in defendant's silver Mustang. Defendant was driving. After receiving a text message from Tegegne's phone number seeking to confirm the address of the bait game, Smith pulled his own vehicle into the parking lot in front of the building. At this point, Smith saw defendant's silver Mustang, pulled closer, and noticed that defendant was armed. Rather than confronting the occupants of the vehicle himself, Smith drove to a nearby Amtrak station parking lot and called 911 to report "a suspicious vehicle . . . occupied by at least two black males [who] appeared [to be] loading up guns." Meanwhile, defendant drove the Mustang to a rear parking area of the complex.

After receiving Smith's 911 call, four officers with the Charlotte-Mecklenburg Police Department—Anthony Holzhauer, David Sussman, Jason Allen, and Luke Amos—were dispatched to 1801 N. Tryon Street. The officers were advised that there were at least two black men inside a silver Mustang in the parking lot with loaded firearms, intending to commit a robbery. Each officer arrived alone in a marked patrol vehicle. Each officer parked his patrol vehicle in a lower portion of the parking lot,

out of view from the rear parking lot. None of the officers activated the lights or sirens on his patrol vehicle.

After investigating and clearing a man in a different silver vehicle near the parking lot entrance, Officer Holzhauer and Officer Sussman walked to the rear parking lot. Officer Holzhauer was carrying a shotgun. Officer Sussman was carrying his service weapon. They observed two dump trucks parked parallel to one another, approximately four feet apart and next to a building, and defendant's silver Mustang, parked perpendicular to the rear of the two trucks and facing away from the building. The officers wanted to approach the vehicle surreptitiously in order to investigate its occupants without being detected, so they decided to walk between the two dump trucks, believing that the path would lead them to the rear of defendant's vehicle. Instead, their route brought them directly to the Mustang's passenger-side window. The officers could not see inside the vehicle because the windows were tinted. They did not affirmatively identify themselves as police officers.

Defendant and the officers would later dispute what happened next. What is undisputed is that there was an exchange of gunshots between defendant and the officers. One of the bullets hit one of the dump truck's side-view mirrors, right near Officer Holzhauer's head. Officer Holzhauer and Officer Sussman sought cover in front of one of the dump trucks. Defendant started the Mustang and sought to escape. To exit the parking lot, he drove the Mustang around the side of the dump truck where Officer Holzhauer and Officer Sussman were sheltering. Believing that they

were being ambushed, Officer Holzhauer and Officer Sussman began shooting at the Mustang as it passed. Defendant eventually steered his vehicle, which sustained a shattered passenger-side window and a shot-out passenger-side front tire, out of the parking lot. Officer Amos and Officer Allen pursued the Mustang in their patrol vehicles, with the lights and sirens of their vehicles now activated. They were eventually joined in pursuit by other officers from the Charlotte-Mecklenburg Police Department, the North Carolina Highway Patrol, the Cabarrus County Sherriff's Office, and the City of Concord Police Department.

According to defendant, it was only after he exited 1801 N. Tryon Street that he realized he had exchanged gunshots with law enforcement officers. He began to fear that he "might not make it out of this one" alive and called his mother to say his final goodbyes. While driving down Route 49 into Cabarrus County, defendant and the occupants of the Mustang put their hands and a white t-shirt out the windows, in an apparent effort to signal their intent to surrender. Defendant also called 911 to explain the situation, in the hopes of figuring out a way to surrender without getting shot at by the pursuing officers. However, defendant never stopped his vehicle. Eventually, law enforcement officers deployed stop sticks and blew out the Mustang's tires. Defendant, Jamel Lewis, and Warren Lewis were all arrested.

Law enforcement officers proceeded to search defendant's Mustang. Inside the driver's seat, they found a six-shot .38-caliber revolver and six spent shell casings. Inside the glove box, they found a cell phone, a knife, a wallet with defendant's

identification inside, wristwatches, credit cards, and various forms of identification. Inside the trunk, they found two rifles and an additional revolver, a bag containing four cellphones, and a bag containing more credit cards, debit cards, and identification cards along with mail addressed to defendant. It was later determined that the credit cards, debit cards, and personal identifications found in the interior and trunk of the Mustang belonged to victims of the underground poker game robbery committed on 24 September 2013.

A grand jury indicted defendant on eleven counts of robbery with a dangerous weapon, eleven counts of second-degree kidnapping, one count of conspiracy to commit robbery with a dangerous weapon, and one count of possession of a firearm by a felon for his alleged role in the events of 24 September 2013. He was indicted on two counts of assault with a deadly weapon with intent to kill (AWDWIK), two counts of assault on a law enforcement officer with a firearm, and one count of possession of a firearm by a felon arising from his 29 September 2013 confrontation with Officer Holzhauer and Officer Sussman.

At trial, the State and defendant offered differing accounts of both incidents. According to the State, defendant was one of the two black men who robbed the underground poker game at gunpoint on 24 September 2013. The State relied upon testimony from six victims of the poker game robbery who all identified defendant as one of the two perpetrators of the robbery, although the victims offered varying accounts of defendant's precise role in the events of that night. Defendant claimed

instead that he lent Jamel Lewis his Mustang on the evening of 23 September 2013 and that Jamel committed the robbery with his brother, Warren Lewis, without defendant's knowledge or permission.

According to the State, defendant came to 1801 N. Tryon Street on 29 September 2013 with the intention of robbing the bait game. Officer Holzhauer and Officer Sussman testified that defendant fired first, unprovoked. Defendant claimed that he drove his Mustang to 1801 N. Tryon Street at Warren's urging, intending only to "check out" the poker game. He testified that as he was sitting in the Mustang, he saw the silhouette of a man with a long gun aimed at him, heard gunshots, and felt an impact on the passenger side of his car. At this point, fearing for his life, defendant testified that he returned fire with the .38-caliber revolver that he always stored in his vehicle.

At the close of the State's evidence, the trial court dismissed two of the robbery with a dangerous weapon charges and one of the second-degree kidnapping charges. During the jury charge, the trial court gave a self-defense instruction for the offenses of AWDWIK and assault on a law enforcement officer with a firearm. Ultimately, the jury found defendant guilty of all remaining charges with the exception of the two counts of assault on a law enforcement officer with a firearm. The trial court consolidated defendant's convictions and entered thirteen separate judgments with thirteen sentencing terms. The trial court ordered defendant to serve the terms

consecutively, resulting in a combined sentence of 872 to 1,203 months incarceration. Defendant gave oral notice of appeal in open court.

On appeal, defendant broadly raised three claims. First, defendant challenged the trial court's jury instructions on self-defense, asserting that the trial court erred by failing to include language requiring the jury to find a "causal nexus" between the circumstances leading to defendant's perceived need to use defensive force and the felonious conduct that would otherwise disqualify him from claiming self-defense under N.C.G.S. § 14-51.4(1). Second, defendant challenged the trial court's refusal to allow him to pursue certain lines of inquiry relating to racial bias and police-officer shootings of black civilians while questioning prospective jurors during voir dire. Third, defendant challenged the trial court's admission of evidence during the State's case-in-chief showing that no disciplinary actions were taken against Officer Holzhauer and Officer Sussman after the shooting on 29 September 2013. In a unanimous opinion, the Court of Appeals rejected each of defendant's claims and found no error in the trial court's judgment. *Crump*, 259 N.C. App. 144, 815 S.E.2d 415. In this Court, defendant presents two of these issues for review: his challenge to the trial court's jury instruction on self-defense and his challenge to the limits imposed by the trial court on his questioning during voir dire. Because of how we resolve defendant's claim regarding the trial court's limitations on his questioning during voir dire, we do not reach his argument regarding the trial court's jury instruction.

The Court of Appeals did not explicitly address whether or not the trial court erred by preventing defendant from asking certain questions of prospective jurors. Nor did the court conclude that defendant's questions were inappropriate or irrelevant subjects for voir dire. Indeed, the court began its analysis by "express[ing its] concern" about the limitations imposed by the trial court on defendant's questioning during voir dire. *Id.* at 145, 815 S.E.2d at 417. Later, the court acknowledged that questions about police-officer shootings of black men "could very well be a proper—even necessary—subject of inquiry as part of the jury voir dire" in a case involving a black male defendant involved in a shooting with police officers "in order to allow both parties—the State and defendant—to intelligently exercise their peremptory challenges." *Id.* at 157, 815 S.E.2d at 424 (cleaned up). However, the court reasoned that even if the trial court erred by restricting defendant's questioning, the trial court's actions could not have been prejudicial because "[p]er defendant's own testimony, it was not until the car chase ensued that he was even aware the individuals he fired on were police officers." *Id.* at 156, 815 S.E.2d at 424.

## Analysis

In general, "[r]egulation of the form of *voir dire* questions is vested within the sound discretion of the trial court." *State v. Chapman*, 359 N.C. 328, 346, 611 S.E.2d 794, 810 (2005); *see also State v. Rodriguez*, 371 N.C. 295, 312, 814 S.E.2d 11, 23 (2018) ("[T]he trial judge has broad discretion to regulate jury *voir dire*.") (quoting *State v. Fullwood*, 343 N.C. 725, 732, 472 S.E.2d 883, 887 (1996)). "[D]efendant must

show abuse of discretion and prejudice to establish reversible error relating to *voir dire*."[1] *State v. Bishop*, 343 N.C. 518, 535, 472 S.E.2d 842, 850 (1996).

Under both the Federal Constitution and the North Carolina Constitution, every criminal defendant has the right to be tried by a fair and impartial jury. *See* U.S. Const. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed . . . ."); N.C. Const. art. I, § 24; *see also State v. Chandler*, 324 N.C. 172, 185–86, 376 S.E.2d 728, 737 (1989) ("Both defendant and the State are entitled to a fair trial and a fair trial requires an impartial jury."). An essential feature of the right to a fair and impartial jury is the right to be tried by jurors who do not judge a party or the evidence based on animus or bias towards a racial group. *See State v. Cofield*, 320 N.C. 297, 302, 357 S.E.2d 622, 625 (1987) ("The people of North Carolina have declared . . . that they will not tolerate the corruption of their juries by racism, sexism and similar forms of irrational prejudice. They have

---

[1] In the alternative, defendant argues that he is not required to show prejudice because restrictions on voir dire questioning which "impair[ ] the defendant's ability to exercise his challenges intelligently [are] grounds for reversal, irrespective of prejudice." *State v. Wiley*, 355 N.C. 592, 611–12, 565 S.E.2d 22, 37 (2002), *cert. denied*, 537 U.S. 1117 (2003). He argues that because he was unable to ask prospective jurors about racial bias and their opinions regarding police-officer shootings of black men, he was unable to identify and challenge biased jurors, either peremptorily or for cause, which was necessary to safeguard his constitutional right to a fair and impartial jury. The State disagrees and, regardless, maintains that defendant waived appellate review of any constitutional argument by failing to specifically note an exception on constitutional grounds at trial. Because we ultimately hold that the trial court's actions were an abuse of discretion that prejudiced defendant, we need not reach defendant's constitutional argument.

recognized that the judicial system of a democratic society must operate evenhandedly if it is to command the respect and support of those subject to its jurisdiction. It must also be *perceived* to operate evenhandedly."); *see also Pena-Rodriguez v. Colorado*, 137 S. Ct. 855, 869, 197 L. Ed. 2d 107 (2017) ("A constitutional rule that racial bias in the justice system must be addressed—including, in some instances, after the verdict has been entered—is necessary to prevent a systemic loss of confidence in jury verdicts, a confidence that is a central premise of the Sixth Amendment trial right."). A defendant is permitted to challenge any individual prospective juror who he or she believes is "unable to render a fair and impartial verdict." N.C.G.S. § 15A-1212(9) (2019). In order to "exercise intelligently . . . their challenges for cause," defendants typically may inquire into prospective jurors' morals, attitudes, and beliefs during voir dire, provided that the inquiry is relevant to a subject at issue at trial. *State v. Carey*, 285 N.C. 497, 507, 206 S.E.2d 213, 221 (1974). In this manner, "[*v*]*oir dire* plays an essential role in guaranteeing a criminal defendant's Sixth Amendment right to an impartial jury"—and the defendant's concomitant rights under the North Carolina Constitution—"because it is the means by which prospective jurors who are unwilling or unable to apply the law impartially may be disqualified from jury service." *State v. Wiley*, 355 N.C. 592, 611, 565 S.E.2d 22, 37 (2002).

However, a defendant's right to ask questions of prospective jurors during voir dire is circumscribed. "It is well established that while counsel are allowed wide

latitude in examining jurors on *voir dire*, the extent and manner of the inquiry rests within the trial court's discretion." *State v. Locklear*, 349 N.C. 118, 142, 505 S.E.2d 277, 291 (1998). Thus, even when a defendant seeks to inquire into a prospective juror's views on an otherwise relevant subject, the trial court may exercise its discretion to restrict the extent and manner of the defendant's questioning. *State v. Cummings*, 361 N.C. 438, 465, 648 S.E.2d 788, 804 (2007) (holding that it is permissible for a trial court to "limit questioning" and "not permit the hypothetical and speculative questions" regarding substantively appropriate topics). For example, a trial court may prevent a defendant from "attempt[ing] to indoctrinate potential jurors as to the substance of [his or her] defense" by asking questions that "tend to stake out a juror as to what his decision would be under a given set of facts." *State v. Parks*, 324 N.C. 420, 423, 378 S.E.2d 785, 787 (1989). A trial court may prevent a defendant from asking prospective jurors "hypothetical questions so phrased as to be ambiguous and confusing or containing incorrect or inadequate statements of the law." *State v. Vinson*, 287 N.C. 326, 336, 215 S.E.2d 60, 68 (1975), *vacated in part on other grounds*, 428 U.S. 902 (1976). A trial court does not abuse its discretion when it prevents a defendant from asking questions that are "irrelevant, improper in form, attempts to 'stake out' a juror, questions to which the answer was admitted in response to another question, or questions that contained an incomplete statement of the law." *State v. Gregory*, 340 N.C. 365, 389, 459 S.E.2d 638, 651 (1995).

In the present case, the trial court prevented defendant from asking two

related sets of questions during voir dire. First, defendant sought to question prospective jurors about the possibility that they harbored racial biases against African Americans.

> [DEFENSE COUNSEL]: Now, something else I want to talk about. This one is a difficult one. It's called implicit bias. It's the concept that race is so ingrained in our culture that there's an implicit bias against people of a particular race, specifically African Americans, that people experience. What I'm going to do is I'm going to ask a couple of pointed questions of you all about that. . . . When you hear the statement the only black man charged with robbery, what's the first thing that pops into your head?
>
> [THE STATE]: Objection.
>
> THE COURT: Sustained.
>
> [DEFENSE COUNSEL]: Is there anything that pops into your head when I say that statement, any thoughts?
>
> [THE STATE]: Objection.
>
> THE COURT: Sustained.

Second, defendant sought to question prospective jurors about their awareness of and opinions regarding incidents of police-officer shootings of black men. Initially, defense counsel attempted to pursue this line of inquiry by asking prospective jurors about their awareness of a case that had recently occurred in Charlotte where a police officer shot and killed an unarmed black man, Jonathan Ferrell.

> [DEFENSE COUNSEL]: There have been some cases in the recent history of this country dealing with this issue, specifically as to some African-American men and police officers is the first thing that comes to mind. Additionally I

expect there to be testimony regarding the Jonathan Ferrell case and what effect that impact—that case had on Mr. Crump's mindset. Is anyone familiar with the Jonathan Ferrell case that happened here in Charlotte approximately September of 2013?

[THE STATE]: Objection, your Honor.

THE COURT: Sustained.

The judge emptied the courtroom and defense counsel explained why he was asking about the Ferrell case. Defense counsel then asked the judge if he could inquire into prospective jurors' opinions regarding police-officer shootings of civilians generally, rather than in the specific context of the Jonathan Ferrell case.

[DEFENSE COUNSEL]: Your Honor, generally as to incidents, can I inquire of the jury if they have opinions related to incidents of cops firing on civilians that happened in the past couple years?

THE COURT: I think that's another stake-out question. I think he's right. Once you get into a quote, unquote here's a situation, what do you think, how would you vote, I think that's a stake-out question, so I would sustain that objection, also.

[DEFENSE COUNSEL]: Understood, your Honor. Please note our exception.

As a threshold matter, the State contends that the trial court did not prohibit defendant from asking *all* questions about racial bias and police-officer shootings of black men. The State disputes the Court of Appeals' conclusions that the trial court "flatly prohibited questioning as to issues of race and implicit bias during *voir dire*" and "categorically denied [defendant] the opportunity to question prospective jurors not only about a specific police officer shooting, but also even *generally* about their

opinions and/or biases regarding police officer shootings of (specifically) black men." *Crump*, 259 N.C. App. at 145, 155, 815 S.E.2d at 417, 423. Instead, the State argues that the trial court appropriately sustained the State's narrow objections to a limited number of improper questions. The distinction between foreclosing upon entire lines of inquiry and rejecting specific inappropriate questions is, in this case, crucial. While a trial court generally has the discretion to regulate the "*manner and the extent* of inquiries [during] voir dire" by rejecting improper questions, *State v. Allen*, 322 N.C. 176, 189, 367 S.E.2d 626, 633 (1988), it exceeds the trial court's discretion to entirely prevent a party from asking any questions at all about an appropriate subject that is relevant at trial. *State v. Robinson*, 330 N.C. 1, 13, 409 S.E.2d 288, 294–295 (1991) (emphasizing that while a defendant in a capital case "is entitled to have prospective jurors informed of the race of the victim and questioned on the issue of racial bias," it is not an abuse of discretion for trial court to manage "the *form and number of questions* on the subject") (quoting *Turner v. Murray*, 476 U.S. 28, 37 (1986)).

In reviewing a challenge to the trial court's management of questioning during voir dire, "we examine the entire record of the jury voir dire, rather than isolated questions." *Parks*, 324 N.C. at 423, 378 S.E.2d at 787. Reading the transcript holistically, we agree with the Court of Appeals that the trial court prevented defendant from pursuing any line of inquiry regarding racial bias, implicit or otherwise. Defendant was unable to ask prospective jurors about racial bias at any point during voir dire. Nor could he ask other related questions that would have

elicited information allowing him to identify, and seek to exclude, biased prospective jurors. *Cf. State v. Elliott*, 344 N.C. 242, 263, 475 S.E.2d 202, 209 (1996) (holding that the trial court did not abuse its discretion where "a careful review of the transcript of the *voir dire* shows that the trial court permitted defendant to explore this panel of prospective jurors' understanding of their right to reach their own opinions," the substantive issue defendant's rejected question sought to address).

Viewed in context, it is clear that defendant's effort to question prospective jurors about the Jonathan Ferrell case represented an attempt to cure the purported deficiencies that caused the trial court to reject his first question about implicit bias.[2] He sought to approach the same topic from a different angle. The connection between the question about the Ferrell case and the topic of racial bias was readily apparent. Defense counsel explicitly referenced "African-American men and police officers" in framing the question for the prospective jurors. He also referenced the protests that erupted after a white police officer shot and killed a black man, Michael Brown, in Ferguson, Missouri, in subsequently explaining why he sought to question jurors about the Ferrell case. Defendant was attempting to address the same substantive

---

[2] While the dissent is correct that defendant does not separately challenge the trial court's refusal to allow his question about the Jonathan Ferrell case on appeal to this Court, defendant's attempted question is still relevant to our analysis of his claim, which must be based upon our examination of "the entire record of the jury voir dire." *Parks*, 324 N.C. at 423, 378 S.E.2d at 787. Notwithstanding defendant's failure to separately challenge the trial court's restriction of this particular question on appeal, the fact that the trial court rejected defendant's question about the Ferrell case, which came immediately after defendant's question about implicit bias, supports our conclusion that the trial court did more than deny a single discrete question about race.

topic—race and racial bias—in a new manner after the trial court rejected his first attempt. As he explained immediately after the trial court denied his initial question about implicit bias, "[t]here have been some cases in the recent history of this country dealing with *this issue*," by which he meant racial bias against black people. Yet his efforts to inquire into this subject were again rebuffed by the trial court, in contrast to cases where this Court has upheld trial court restrictions on voir dire questioning. Although defendant in this case "made . . . an attempt [after his first attempt was denied] to clarify or rephrase the question," the trial court was not "willing to allow the question [after] defendant had provided more clarity." *State v. Davis*, 340 N.C. 1, 23, 455 S.E.2d 627, 638–39 (1995).

The dissent's claim that "there is simply nothing in the transcript to support the proposition that the trial court would have prohibited defense counsel from asking further questions to the prospective jurors on [the topic of racial bias]" rests on the incorrect belief that after being denied the opportunity to ask prospective jurors the question about implicit bias, defendant abandoned this line of inquiry altogether. Although it is true that defense counsel's question about "incidents of cops firing on civilians . . . did not even mention race," the dissent ignores the numerous contextual indicators which make it clear that his question about police-officer shootings—which directly followed a question about implicit racial bias and a question about a prominent incident of a police officer shooting a black man—was a question that was, in substantial part, about race. We are not impermissibly "analyzing the relevance of

questions defense counsel *never actually asked*," as the dissent contends, simply because we interpret the meaning of defense counsel's questions by examining the context in which they arose. In our view, the fact that the trial court rejected three questions in a row that related to the topic of racial bias is strong evidence that "the trial court would have prohibited . . . further questions to the jurors" about racial bias, even if defense counsel did not return to the subject again after being repeatedly denied. By the dissent's logic, a trial court does not abuse its discretion even if it rejects every question a defendant asks about a substantively appropriate topic, provided that the trial court never expressly states that the defendant is not allowed to inquire into the subject. Such a proposition finds no support in our precedents and would convert an important right necessary to assure the fairness of a criminal proceeding into a hollow promise.

We agree with the Court of Appeals that the trial court "categorically denied [defendant] the opportunity to question prospective jurors not only about a specific police officer shooting, but also even *generally* about their opinions and/or biases regarding police officer shootings of (specifically) black men." *Crump*, 259 N.C. App. at 155, 815 S.E.2d at 423. The State argues that the trial court possessed the discretion to reject these questions because they were "stake out questions" designed "to ascertain how [a] prospective juror would vote upon a given state of facts." *State v. Burr*, 341 N.C. 263, 286, 461 S.E.2d 602, 614 (1995). This is incorrect. Defendant's questions about the Jonathan Ferrell case specifically, and about police-officer

shootings of black men generally, were not impermissible stakeout questions. As this Court has previously explained, a question is "not an improper stakeout of a prospective juror" when "(1) the question did not incorrectly or inadequately state the law, (2) the question 'was not an impermissible attempt to ascertain how this prospective juror would vote upon a given state of facts,' and (3) the question permissibly sought to measure the ability of the prospective juror to be unbiased." *State v. Jones*, 347 N.C. 193, 204, 491 S.E.2d 641, 648 (1997) (citation omitted).[3] Merely asking prospective jurors if they are "familiar with the Jonathan Ferrell case that happened here in Charlotte approximately September of 2013" and if they "have opinions related to incidents of cops firing on civilians that happened in the past couple years" is not an attempt to "predetermine what kind of verdict prospective jurors would render or how they would be inclined to vote." *Id*. Defendant did not present prospective jurors with a "hypothetical fact situation" and then "ask[ ] what kind of verdict they would render under certain named circumstances." *Parks*, 324 N.C. at 423, 378 S.E.2d at 787. He asked if they were aware of a recent case in Charlotte and if they had opinions about police-officer shootings of unarmed black

---

[3] We certainly agree with the State, as they argued in their brief, that "depending on the way defendant phrased questions about how incidents of cross-racial officer-involved shootings relate to the factual issue of who fired first in his case, such questions certainly have the potential, at least, to also be stake-out questions." But we examine the questions the defendant actually asked, not the universe of questions a defendant could possibly have asked about a given subject.

men. Those are not stakeout questions as defined by this Court's precedents.[4]

The mere fact that the question defense counsel asked (or tried to ask) implicated a factual circumstance bearing similarity to the defendant's own case does not transform an appropriate question into an impermissible stakeout question. For example, in *Burr*, we held that it was permissible for counsel to ask prospective jurors if they could "focus . . . on whether or not this defendant, Mr. Burr, is guilty or not guilty of killing the child" if presented with evidence that the child was neglected or abused, even though the case involved the death of a child who had previously been neglected and abused. 341 N.C. at 286, 461 S.E.2d at 614. The question deemed appropriate in *Burr* explicitly asked prospective jurors to forecast how they might approach the question of defendant's guilt or innocence if presented with circumstances that were going to be presented at trial. This question was "substantially more direct in relation to the verdict itself" than the question at issue in the present case, and yet still permissible. *Jones*, 347 N.C. at 204, 491 S.E.2d at

_____

[4] The dissent would hold that the trial court did not abuse its discretion when it denied defendant the opportunity to ask about the Ferrell case and about police-officer shootings more generally because the questions "were wholly unrelated to the incident for which defendant was on trial . . . [and] were likely to confuse and distract the jurors from the facts of the present case." Questions about the Ferrell case and police-officer shootings of black men were not "wholly unrelated to the incident for which defendant was on trial," given that the trial required the jury to make a determinative assessment of the credibility of, on the one hand, a black man who had been fired upon by police officers, and, on the other hand, the police officers involved in the shooting. Further, the trial court's stated justification for rejecting the question was its determination that the question represented "another stake-out question." Yet there is nothing in the transcript to support the dissent's assertion that the trial court was concerned this question would "confuse and distract the jurors."

648.

Further, defendant's questioning about the Ferrell case and police-officer shootings of black men had a proper purpose in the context of *voir dire*: the questions "sought to measure the ability of the prospective juror[s] to be unbiased," *Jones*, 347 N.C. at 204, 491 S.E.2d at 648, by soliciting responses that would help defendant determine if "the prospective juror[s] could impartially focus on the issue of defendant's guilt or innocence, regardless of" the factual circumstances surrounding the legal question they would be required to resolve. *Burr*, 341 N.C. at 286, 461 S.E.2d at 614. As defense counsel explained at trial, he wanted to ask questions that would enable him to "make sure that the jurors are properly qualified to hear this trial" by assessing whether or not they held "opinions [that] would impact their ability to determine the evidence in this case."[5] Our precedents establish that defendant's proposed question about police-officer shootings of black men was an appropriate

_____

[5] The dissent strenuously emphasizes the fact that when defense counsel was asked to explain why he wanted to ask about the Ferrell case, he stated that the question related to an argument defendant planned to raise regarding his state of mind as he was fleeing the scene of the shooting. However, the dissent ignores the additional, broader justification offered by defense counsel in the same colloquy. Even if we agreed with the dissent that the only place to look in the transcript for evidence of defense counsel's purpose in asking the more general question about police-officer shootings is the explanation defense counsel offered for asking a different, preceding question, our characterization of defendant's purpose in asking about police-officer shootings is amply supported by a reading of the transcript of the full colloquy, during which defense counsel also explained that he wanted "to make sure that the jurors are properly qualified to hear this trial" by determining "if [the prospective jurors] have opinions about [the Ferrell] case," and then "explor[ing] if those opinions would impact their ability to determine the evidence in this case."

inquiry into a relevant topic, not an impermissible stakeout question.[6]

Based on the foregoing analysis, we agree with the Court of Appeals that the trial court "flatly prohibited" questions about racial bias and "categorically denied" defendant the opportunity to ask prospective jurors about police-officer shootings of black men. *Crump*, 259 N.C. App. at 145, 155, 815 S.E.2d at 417, 423. We hold further that in a case such as this one "involving a black male defendant involved in a shooting with police officers," *id.* at 157, 815 S.E.2d at 424, the trial court abused its discretion in so doing. This conclusion does not cast doubt upon the settled proposition that a trial court may discretionarily prevent parties from asking questions during voir dire that are "inherently ambiguous and totally confusing to prospective jurors." *Vinson*, 287 N.C. at 338, 215 S.E.2d at 69. Admittedly, defendant's initial question about implicit bias was somewhat confusingly phrased. However, as we have explained, there is a significant difference between rejecting one confusingly phrased question but permitting follow-up questions that clarify or reframe the inquiry and restricting appropriate questioning on a relevant topic altogether.

Having determined that the trial court's erroneous restriction on defendant's questioning during *voir dire* was an abuse of discretion, we now turn to the question

---

[6] In the alternative, the State contends that it was within the trial court's discretion to prohibit questions about a "divisive, extraneous case which had the potential to inflame the jury's prejudice and passions." Assuming *arguendo* that this explanation justified the trial court's decision to prevent defendant from asking about the Jonathan Ferrell case specifically, the State offers no reason why that explanation applies to defendant's more general question about police-officer shootings.

of whether or not defendant "was prejudiced thereby." *State v. Maness*, 363 N.C. 261, 269, 677 S.E.2d 796, 802 (2009). An error is prejudicial "when there is a reasonable possibility that, had the error in question not been committed, a different result would have been reached at the trial out of which the appeal arises." N.C.G.S. § 15A-1443(a) (2019).

Defendant asserts that he was prejudiced by the trial court's restrictions on his questioning during voir dire because the jurors' determination of his guilt or innocence depended upon their resolution of a core factual dispute—who shot first on the night of 29 September 2013, defendant or the police officers—based solely on their weighing of defendant's and the officers' competing accounts. Thus, defendant contends that if he had been given the opportunity to assess the jurors' possible racial biases and opinions regarding police-officer shootings of black men, he would have been able to intelligently exercise his for-cause and peremptory challenges in a manner that would have allowed him to exclude jurors who might impermissibly base their decision to believe one witness and disbelieve the other on improper biases. In addition, defendant emphasizes that the questions he sought to ask were also relevant to other disputed facts considered by the jury at trial, most notably what inference to draw from defendant's refusal to immediately surrender to law enforcement officers after the shooting. In response, the State echoes the Court of Appeals in first contending that the trial court's restrictions could not have prejudiced defendant because "it was not until the car chase ensued that he was even aware the

individuals he fired on were police officers." *Crump*, 259 N.C. App. at 156, 815 S.E.2d at 424. Relatedly, the State asserts that "defendant's race and the officers' occupation were essentially co-incidental to the crimes in this case." Finally, the State also argues that the restrictions on questioning were not prejudicial because defendant was permitted to ask numerous other questions which elicited information about the prospective jurors' attitudes towards law enforcement officers.

Addressing the State's first argument, we disagree with the Court of Appeals that defendant could not have been prejudiced because he did not know the individuals he was shooting at were police officers at the time of the shooting. It is true that defendant testified that he did not know he was firing at law enforcement officers.[7] But it is also true that the law enforcement officers knew that the occupants of the silver Mustang they were approaching were armed black men, given that the dispatch call summoning the officers to 1801 N. Tryon Street reported "two black males inside a Mustang loading firearms." Regardless, defendant's purported lack of awareness that he was shooting at police officers does not alter the possible relevance of any biases held by the jurors to their own resolution of this determinative factual

---

[7] It is notable that during closing argument, the State argued that at the time he fired his weapon, "[d]efendant knew or had reasonable grounds to believe that Anthony Holzhauer and David Sussman were, in fact, police officers. . . . [b]ecause we know that [the officers] did announce themselves. . . . They had their uniforms on with white patches, large white patches on either shoulder, a shiny badge, and a shiny nameplate, both of which reflected light." At a minimum, this indicates that it was an open factual question at trial whether or not defendant knew or had reasonable grounds to believe that he was firing on law enforcement officers.

dispute. A juror who harbored racial animus against black people—or who believed that any police officer who shot an unarmed civilian was inevitably in the wrong— might struggle to fairly and impartially determine whose testimony to credit, whose version of events to believe, and, ultimately, whether or not to find defendant guilty.

In addition, there were other important factual disputes at trial where defendant's race, and the jurors' possible biases, were relevant. As defense counsel explained in a colloquy with the trial court, one of the reasons he wanted to ask prospective jurors about police-officer shootings of black men like Jonathan Ferrell was because he intended to argue that defendant's awareness of these incidents "directly impacted [his] state of mind as to why he was not stopping for police when they were firing at him. It goes to rebut the contention that the [S]tate I assume will make that he was fleeing the scene of the crime."[8] As defense counsel predicted, the State put this exact argument before the jurors, urging them to conclude that defendant's refusal to immediately surrender to law enforcement officers was motivated not by a fear that he would not survive his interaction with the police, but

---

[8] Even if defense counsel had failed to offer sufficiently compelling reasons for asking about the Jonathan Ferrell case at trial, defense counsel was not asked and did not provide his reasons for asking about police-officer shootings of black men more generally. Thus, we also reject the State's argument that we must restrict our examination of defendant's prejudice claim to the explanations defense counsel offered during his colloquy with the trial court. The dissent claims that our willingness to look beyond this colloquy "appears to be saying that this Court is free to come up with arguments of its own that trial counsel could— and perhaps should—have made in the trial court." However, we think it uncontroversial to suggest that when defense counsel offered an explanation for asking the second question in a series of three questions, it does not legally or logically mean that his explanation addressed all of his substantive reasons for asking the third question.

instead by a desire to escape apprehension "because he thought that the Charlotte-Mecklenburg Police Department—maybe they'll stop at the county line." And, as defense counsel previewed, defendant argued in reply that he was reluctant to surrender to law enforcement because he had just been "shot at by someone who he eventually learned was the police" and he "[f]ear[ed] for his life."

Nor was the law enforcement officers' occupation "co-incidental" to the jury's resolution of defendant's case.[9] During closing argument, the State explicitly emphasized Officer Holzhauer and Officer Sussman's occupation in disputing defendant's version of events, asking rhetorically "[w]hy [ ] two Charlotte-Mecklenburg police officers [would] walk up to a car that they didn't know was occupied, that wasn't even turned on, and just open fire with a shotgun. That doesn't make any sense whatsoever, it just doesn't." The State relied upon Officer Holzhauer and Officer Sussman's status as police officers in order to persuade the jury that their account of the incident on 29 September 2013 was more accurate than the one put forward by defendant, a black man who had admitted to shooting at the officers. If the jurors believed the law enforcement officers, it was overwhelmingly likely that they would convict defendant. In this context, defendant's race and the police officers' occupation were not extraneous to the issues resolved by the jury at trial.

---

[9] It would be wrong to conclude that the law enforcement officers' occupation was "co-incidental to the crimes in this case" when one of the crimes defendant was charged with was assault on a law enforcement officer with a firearm, an essential element of which is the victim's occupation as a law enforcement officer. N.C.G.S. § 14-34.5(a) (2019).

Finally, we reject the State's argument that defendant was not prejudiced because the trial court allowed him to ask the prospective jurors other questions about their attitudes toward law enforcement officers. It is correct that both parties asked numerous questions inquiring into the prospective jurors' attitudes regarding police officers, their past interactions and personal relationships with police officers, and their awareness that police-officer witnesses are not to be accorded special credibility. However, none of these questions touched upon issues of race, and none elicited information about the prospective jurors' opinions of police-officer shootings of black men. While we do not impugn the integrity of the jurors who ultimately decided to convict defendant, defendant's inability to question prospective jurors about racial bias and police-officer shootings of black men deprived him of a crucial tool needed to mitigate the risk that his trial would be infected by racial prejudice. Peter A. Joy, *Race Matters in Jury Selection*, 109 NW. U. L. Rev. Online 180, 186 (2015) ("Especially in times when issues of race are on the minds of potential jurors, such as currently in the St. Louis area due to the shooting of Michael Brown and continuing protests in Ferguson and several other cities over racial injustices, failing to question about bias in some cases may result in stacking the jury against the accused.") General questioning about prospective jurors' attitudes towards law enforcement is simply no substitute for inquiry into prospective jurors' racial biases when, as in the present case, the defendant's race and the law enforcement officers'

occupation are salient at trial.[10] Thus, we conclude the trial court's restrictions on defendant's questioning during voir dire were prejudicial.

Conclusion

It is a jury that is tasked with "find[ing] the ultimate facts beyond a reasonable doubt." *State v. White*, 300 N.C. 494, 503, 268 S.E.2d 481, 487 (1980) (quoting *Cnty. Ct. of Ulster Cnty., N.Y. v. Allen*, 442 U.S. 140, 156 (1979)). To protect a criminal defendant's right to be found guilty or not guilty by a jury that discharges this weighty responsibility fairly and impartially, through "[p]robing and thoughtful deliberation," a defendant is entitled to question prospective jurors on topics that would help him identify, and seek to exclude, those whose "reasoning . . . is prompted or influenced by improper biases, whether racial or otherwise." *Pena-Rodriguez*, 137 S. Ct. at 871,

---

[10] Contrary to the State's assertion that any reference to the Jonathan Ferrell case would have been "highly divisive" and would have "inflame[d] the jury's prejudice and passions," numerous empirical studies have concluded that white jurors are *more* likely to discriminate against black defendants in cases where racial issues are not prominent or referenced explicitly. *See generally* Samuel R. Sommers & Phoebe C. Ellsworth, *White Juror Bias: An Investigation of Prejudice Against Black Defendants in the American Courtroom*, 7 Psychol. Pub. Pol'y & L. 201, 203 (2001). At a minimum, this empirical data suggests that the way to stop jurors' racial biases from undermining the fairness of criminal proceedings is not to stop parties from openly discussing race, but instead to acknowledge and discuss these issues sensitively, appropriately, and forthrightly. *Cf.* Cynthia Lee, *Making Race Salient: Trayvon Martin and Implicit Bias in a Not Yet Post-Racial Society*, 91 N.C. L. Rev. 1555, 1563 (2013) (describing studies which show that "making race salient or calling attention to the operation of racial stereotypes encourages individuals to suppress what would otherwise be automatic, stereotype-congruent responses and instead act in a more egalitarian manner. . . . [W]hen race is made salient, individuals tend to treat White and Black defendants the same."); Gary Blasi, *Advocacy Against the Stereotype: Lessons From Cognitive Social Psychology*, 49 UCLA L. Rev. 1241, 1277 (2002) (arguing that empirical studies "suggest that there is good reason explicitly to instruct juries in every case, stereotype-salient or not, about the specific potential stereotypes at work in the case").

197 L. Ed. 2d at 127. In this case, where there was a clear connection between the questions defendant asked or tried to ask prospective jurors and meaningful factual disputes that the jury was required to resolve to reach a verdict, the trial court abused its discretion and prejudiced defendant by restricting all inquiry into prospective jurors' racial biases and opinions regarding police-officer shootings of black men. Accordingly, we reverse.

REVERSED.

Justice DAVIS dissenting.

The issue in this case is whether the trial court abused its discretion by ruling during voir dire that defense counsel would not be permitted to ask the prospective jurors three specific questions. Defense counsel sought to ask these questions pursuant to a defense strategy involving defendant's state of mind at the time of the incident giving rise to the charges for which he was being tried. Rather than focusing on the specific questions defense counsel actually sought to ask and the reasons he actually articulated to the trial court as his purpose for asking these questions, the majority instead bases its analysis on questions defense counsel *could* have asked and grounds that counsel *could* have asserted as to why these questions were appropriate. Therefore, I respectfully dissent.

Initially, it is important to clarify the proper standard of review to be employed by this Court in reviewing defendant's arguments in this appeal. Defendant contends in his briefs to this Court that the trial court's limitation on his ability to ask certain questions during voir dire amounted to a deprivation of his constitutional right to intelligently exercise his peremptory challenges, thereby entitling him to a new trial—irrespective of whether he can show prejudice. However, defendant has clearly waived this constitutional argument.

It is well established that "[c]onstitutional questions not raised and passed on by the trial court will not ordinarily be considered on appeal." *State v. Meadows*, 371

N.C. 742, 749 (2018) (alteration in original) (citation omitted). Before the trial court, defendant failed to raise any specific constitutional argument as to why he should be allowed to pursue these lines of inquiry with the prospective jurors. Accordingly, any constitutional challenge to the trial court's rulings during voir dire has been waived by defendant.

Therefore, in order to prevail on this issue defendant must show both an abuse of discretion by the trial court and resulting prejudice to him. This Court has previously articulated our standard of review in such cases as follows:

> The primary goal of the jury selection process is to ensure selection of a jury comprised only of persons who will render a fair and impartial verdict. Pursuant to N.C.G.S. § 15A-1214(c), counsel may question prospective jurors concerning their fitness or competency to serve as jurors to determine whether there is a basis to challenge for cause or whether to exercise a peremptory challenge. . . . [T]he trial judge has broad discretion to regulate jury *voir dire.* In order for a defendant to show reversible error in the trial court's regulation of jury selection, a defendant must show that the court abused its discretion and that he was prejudiced thereby.

*State v. Rodriguez*, 371 N.C. 295, 311–12 (2018) (cleaned up); *see also State v. Ward*, 354 N.C. 231, 255 (2001) ("To demonstrate reversible error in the jury selection process, the defendant must show a manifest abuse of the court's discretion and prejudice resulting therefrom.").

This Court has explained that an abuse of discretion occurs "where the court's ruling is manifestly unsupported by reason or is so arbitrary that it could not have

been the result of a reasoned decision." *State v. Hennis*, 323 N.C. 279, 285 (1988). A defendant is prejudiced by a trial court's erroneous ruling when "there is a reasonable possibility that, had the error in question not been committed, a different result would have been reached at the trial out of which the appeal arises." N.C.G.S. § 15A-1443(a) (2019). Accordingly, the two questions before us are (1) whether the limitations imposed by the trial court during voir dire were arbitrary or manifestly unsupported by reason; and (2) whether defendant can demonstrate that absent those limitations, there is a reasonable possibility that the jury would have reached a different result.

The crux of defendant's argument is that the trial court abused its discretion by prohibiting him from questioning prospective jurors about their views on certain unrelated incidents involving shootings by law enforcement officers. Defendant's entire argument is based upon the following exchange that took place on the fourth day of a lengthy voir dire process after defense counsel had previously asked prospective jurors about their ability to remain impartial when hearing testimony from police officers and persons convicted of crimes, as well as their thoughts on the use of self-defense, the use of firearms, and illegal gambling. In order to demonstrate why the majority's analysis is incorrect, this portion of the proceedings must be considered in its entirety.

> [DEFENSE COUNSEL]: Now, something else I want to talk about. This one is a difficult one. It's called implicit bias. It's the concept that race is so ingrained in our culture

that there's an implicit bias against people of a particular race, specifically African Americans, that people experience. What I'm going to do is I'm going to ask a couple of pointed questions of you all about that. . . . When you hear the statement the only black man charged with robbery, what's the first thing that pops into your head?

[PROSECUTOR]: Objection.

THE COURT: Sustained.

[DEFENSE COUNSEL]: Is there anything that pops into your head when I say that statement, any thoughts?

[PROSECUTOR]: Objection.

THE COURT: Sustained.


[DEFENSE COUNSEL]: There have been some cases in the recent history of this country dealing with this issue, specifically as to some African-American men and police officers is the first thing that comes to mind. Additionally I expect there to be testimony regarding the Jonathan Ferrell case *and what effect that impact—that case had on Mr. Crump's mindset.* Is anyone familiar with the Jonathan Ferrell case that happened here in Charlotte approximately September of 2013?

[PROSECUTOR]: Objection, your Honor.

THE COURT: Sustained.

[DEFENSE COUNSEL]: Your Honor, it's an issue that we need to discuss.

. . . .

[DEFENSE COUNSEL]: Yes. *There's a reason I'm asking about this. I expect that at some point the [S]tate is going to talk about flight, specifically as relates to the assault charges. I expect that they're going to ask the Court at some*

-4-

*point for a flight instruction, that that be considered part of guilt. We have the opportunity for Mr. Crump to testify, to talk about his state of mind. Certainly if he's claiming self-defense, he has—is required to testify about his state of mind at that point in time.*

*My expectation is that this testimony regarding the Jonathan Ferrell case is relevant to Mr. Crump's state of mind* in that this case, the Jonathan Ferrell case, happened just two weeks prior to this particular case. The Jonathan Ferrell case, as the Court probably is aware, but for purposes of the record, there was a young black man by the name of Jonathan Ferrell who was involved in some sort of incident that night. Eventually the police were called, and there was an officer that fired and ended up killing . . . Mr. Ferrell that night. I think that that incident happening just two weeks prior to this one, not far on the heels of Ferguson, *directly impacted Mr. Crump's state of mind as to why he was not stopping for police when they were firing at him. It goes to rebut the contention that the [S]tate I assume will make that he was fleeing the scene of the crime. Our intention is to rebut that, saying he was fleeing to save his life and was scared that there were shots fired at him, there were stop sticks deployed that made the tires explode that sounded like further shots. That was the reason that there was flight.*

If that's the case, your Honor, it is imperative that we find out what this jury thinks about that situation, if any. This is an explosive issue, it's an issue that needs to at least be discussed. And they may have no opinions, I don't know. But it's certainly something that I need to be able to inquire about to see if they do have opinions, and if they do, what those opinions are *as related to Mr. Crump and his ability to—or, excuse me—his state of mind at the time of this offense.*

You know, if it's going to be something that's testified about, you know, I think it will be admissible, that this jury should be made aware of that possibility and we be able to gauge their reactions to it.

THE COURT: Okay. Thank you. Yes, sir, [prosecutor].

[PROSECUTOR]: Your Honor, I think before we go any further, there needs to be a *Harbison* inquiry of this defendant. . . .

. . . .

THE COURT: Okay. Now let's talk about the other issue . . . bringing in this extraneous trial, what may not have been on Mr. Crump's mind.

[PROSECUTOR]: Absolutely, your Honor. There's at this point no evidence that has been presented, there's no evidence that Mr. Crump had any idea that that event had happened. The event had been reported on, yes, but there were very few details that were out in the public sphere. Mr. Crump hasn't testified under oath or any other way about any type of knowledge.

Your Honor, this is an improper stake-out question on a particular issue. [Defense counsel] is asking these folks essentially how they would vote based on having this information in front of them, and that's an improper question, your Honor, and there—obviously we haven't got any evidence. So whether or not this is even relevant, whether it will ever come to the jury's attention, is completely speculative at this point and serves only one purpose, your Honor. Thank you.

THE COURT: Yes, sir. [Defense counsel].

[DEFENSE COUNSEL]: Just briefly on that. Frankly, if— we're before evidence. We don't know what any of the evidence will be at this point, so that the argument that we don't know whether or not this is going to come before the jury, we don't. We can only speculate at this point. That's

what the job of the attorneys is, to speculate, to preview the evidence. Some things may be deemed admissible or not. We don't know at this point.

The purpose of the jury selection is to make sure that the jurors are properly qualified to hear this trial. I contend this is not a stake-out question. I'm simply asking if anyone had heard about the reporting of this case. It happened two weeks prior to this incident. And then if they had, which is where we're getting to, what, if any, opinions they hold about that case; and then if they have any opinions about that case, I will explore if those opinions would impact their ability to determine the evidence in this case. That's—I think it's important, I think that it's necessary for the jury to be prepared for these kinds of questions.

THE COURT: So that I'm completely clear on this issue, this case that you're referring to is the Jonathan Ferrell case.

[DEFENSE COUNSEL]: Yes, sir.

THE COURT: I believe that was actually the case that resulted in Officer Kerrick being tried?

[DEFENSE COUNSEL]: That's correct. Yes, your Honor. The defendant was Officer Kerrick. I was referring to the decedent.

THE COURT: Okay. So this is—we're talking about—so I know what we're talking about. The Jonathan Ferrell case is the case where Charlotte-Mecklenburg Police Officer Kerrick was charged and tried for that offense.

[PROSECUTOR]: And acquitted, your Honor.

> THE COURT: And acquitted. Okay. But regardless, I just want to make sure I understand what it was. So I'm going to sustain the objection. We're not going to go down that road during jury selection, if it comes to the point during the trial that this becomes an issue, then we can have a lot more discussions about it, but I'm not going to get into an extraneous case that happened in Charlotte during jury selection, so I'm going to sustain that objection.
>
> [DEFENSE COUNSEL]: Your Honor, generally as to incidents, can I inquire of the jury if they have opinions related to incidents of cops firing on civilians that happened in the past couple years?
>
> THE COURT: I think that's another stake-out question. I think [the prosecutor is] right. Once you get into a quote, unquote here's a situation, what do you think, how would you vote, I think that's a stake-out question, so I would sustain that objection, also.
>
> [DEFENSE COUNSEL]: Understood, your Honor. Please note our exception.

(Emphases added).

In holding that the trial court abused its discretion by making these rulings, the majority's analysis contains two fundamental errors. First, the majority fails to focus on the specific questions that defense counsel actually sought to ask the prospective jurors. Second, it fails to properly acknowledge the reasons articulated by defense counsel as to why he sought to ask those questions.

First, the majority mischaracterizes defense counsel's proposed lines of voir-dire questioning. The majority asserts that "the trial court prevented defendant from pursuing any line of inquiry regarding racial bias." The above-quoted portion of the

transcript shows that this assertion is simply not true. In reality, the trial court's rulings were quite narrow—only prohibiting defense counsel from asking three discrete questions: (1) "When you hear the statement the only black man charged with robbery, what's the first thing that pops into your head?"; (2) "Is anyone familiar with the Jonathan Ferrell case that happened here in Charlotte approximately September of 2013?"; and (3) "[G]enerally as to incidents, can I inquire of the jury if they have opinions related to incidents of cops firing on civilians that happened in the past couple years?"

The majority simply ignores the fact that (1) defense counsel never actually asked the prospective jurors non-objectionable questions about the general topic of racial bias; and (2) the trial court never actually ruled that this subject was not a permissible topic for questioning. Indeed, as noted above, the trial court *allowed* defense counsel to explain the concept of implicit bias to the prospective jurors. It was only when the State objected to defense counsel's confusing question—"When you hear the statement the only black man charged with robbery, what's the first thing that pops into your head?"—that the trial court intervened by sustaining the State's objection.

Following the trial court's ruling, defense counsel never returned to the subject of implicit bias or racial bias generally. Thus, there is simply nothing in the transcript to support the proposition that the trial court would have prohibited defense counsel from asking further questions to the prospective jurors on these topics. Accordingly,

by asserting that an abuse of discretion occurs when a trial court "entirely prevent[s] a party from asking any questions at all about an appropriate subject that is relevant at trial[,]" the majority is simply building a straw man and then knocking it down, as the trial court did no such thing.

After the trial court informed defense counsel that he could not ask about "incidents of cops firing on civilians that happened in the past couple years"—a question that did not even mention race—defense counsel did not seek clarification as to the boundaries of this ruling or ask any other questions on race-related issues. Instead, he simply moved on to another topic. It was the responsibility of defense counsel to ask appropriate questions during voir dire, and the trial court certainly had no duty to help defense counsel formulate properly worded questions or to suggest possible subjects of inquiry.

The majority purports to recognize this proposition when it states that "we examine the questions the defendant actually asked, not the universe of questions a defendant could possibly have asked about a given subject." This statement is odd, however, because the majority's analysis proceeds to do the exact opposite—that is, analyzing the relevance of questions defense counsel *never actually asked*.

Upon an examination of the three discrete questions that defense counsel actually posed to the prospective jurors, it is clear that the trial court did not abuse its discretion in disallowing them. Defendant's first question to the jurors—"When you hear the statement the only black man charged with robbery, what's the first

thing that pops into your head?"—was properly excluded as an awkward and poorly-worded inquiry that was likely to confuse the prospective jurors. This Court has previously explained that it is within the trial court's broad discretion in regulating voir dire to disallow questions that are confusing or ambiguous. *See, e.g., State v. Jones*, 347 N.C. 193, 202 (1997) ("On the *voir dire . . .* of prospective jurors, hypothetical questions so phrased as to be ambiguous and confusing or containing incorrect or inadequate statements of the law are improper and should not be allowed."); *State v. Vinson*, 287 N.C. 326, 338 (1975) (holding that a voir dire question was "properly rejected" by the trial court because the form of the question was "inherently ambiguous and totally confusing to prospective jurors"), *vacated in part on other grounds*, 428 U.S. 902 (1976).

Defense counsel's question here was ambiguous in several respects. To begin with, it is not at all clear what defense counsel was referring to by referencing "the only black man charged with robbery." The two individuals who witnesses identified as the poker-game robbers here—defendant and Jamel Lewis—were both black men. Both defendant and Lewis were subsequently charged with robbery offenses, and Lewis eventually pled guilty to armed robbery while defendant proceeded to trial.

Thus, given that both black men involved in the poker-game robbery were charged with robbery offenses, this statement by defense counsel was based upon a factually inaccurate premise and was appropriately disallowed. *See Vinson*, 287 N.C. at 338 (holding that the trial court properly rejected a voir dire question that was

"premised on . . . an assumption [that was] not supported by the record"). Moreover, it is not clear what type of information defense counsel hoped to glean from the prospective jurors by posing this odd hypothetical. If defense counsel was aiming to uncover implicit racial bias in the prospective jurors, there were much simpler and less confusing ways to go about accomplishing that objective.

The trial court's ruling on defendant's second question posed to the jury—"Is anyone familiar with the Jonathan Ferrell case that happened here in Charlotte approximately September of 2013?"—is not before this Court. Defendant's briefs in this Court make clear that he is not challenging the trial court's ruling as to that question in this appeal, stating that "[t]he ruling relating to the Ferrell case is not challenged in this appeal." *See State v. Thompson*, 306 N.C. 526, 533 (1982) ("[A]ssignments of error not briefed and argued by defendant are deemed abandoned under N.C. Rule of Appellate Procedure 28(a)."); N.C. R. App. P. 28(a) ("Issues not presented and discussed in a party's brief are deemed abandoned."). Given defendant's decision not to appeal this issue, the majority has no proper basis for proceeding to analyze the propriety of the trial court's ruling regarding the question about the Ferrell case.

The trial court's refusal to allow defendant's third question—"[G]enerally as to incidents, can I inquire of the jury if they have opinions related to incidents of cops firing on civilians that happened in the past couple years?"—was also not an abuse of discretion. Given the wide discretion that trial courts possess to regulate voir dire, it

is difficult to understand how the trial court's prohibition on questions regarding specific police shootings that were wholly unrelated to the incident for which defendant was on trial—questions that were likely to confuse and distract the jurors from the facts of the present case—could amount to an abuse of discretion. Indeed, although the majority pays lip service to the broad discretion possessed by trial courts during voir dire to prohibit questions that have the potential to divert the attention of the jurors from the case at hand, the remainder of its analysis essentially ignores the existence of such discretion.

A second reason why the majority's analysis is erroneous is that it largely ignores the reasons articulated by defense counsel to the trial court for asking the questions at issue in this appeal. As explained above, defense counsel argued before the trial court that he intended to introduce evidence of the Ferrell case and other unrelated police shootings in order to speak to defendant's "state of mind" at the time of the offense. Defense counsel stated unambiguously that "[m]y expectation is that this testimony regarding the Jonathan Ferrell case is relevant to Mr. Crump's state of mind in that this case, the Jonathan Ferrell case, happened just two weeks prior to this particular case" and "directly impacted Mr. Crump's state of mind" at the time of the offense. Defense counsel further stated that this state-of-mind evidence would "go[ ] to rebut the contention that . . . [defendant] was fleeing the scene of the crime," in addition to being relevant to his self-defense claim. Defense counsel argued that it was "imperative" that he "be able to inquire about . . . what [the prospective jurors']

opinions are as related to Mr. Crump and his ability to—or, excuse me—his state of mind at the time of this offense." Defense counsel never informed the trial court of any other specific reason for wanting to ask these questions.

Rather than assess these specific grounds that defense counsel articulated to the trial court as the basis for asking these questions, the majority instead makes the extraordinary assertion that "we also reject the State's argument that we must restrict our examination . . . to the explanations defense counsel offered during his colloquy with the trial court." In other words, the majority appears to be saying that this Court is free to come up with arguments of its own that defense counsel could—and perhaps should—have made in the trial court and then rely on those same manufactured grounds to hold that the trial court abused its discretion. Needless to say, such a proposition is inconsistent with both law and logic.

By substituting more favorable arguments for the defendant than those actually made by defense counsel in the trial court, the majority is complicit in defendant's attempts to "swap horses" on appeal. *State v. Sharpe*, 344 N.C. 190, 194 (1996) ("This Court has long held that where a theory argued on appeal was not raised before the trial court, 'the law does not permit parties to swap horses between courts . . . .' "). This Court has made clear that such attempts to advance a more favorable legal theory on appeal are impermissible. Instead, our review is limited to the theory upon which defendant actually relied in the trial court. *See, e.g., State v. Hunter*, 305 N.C. 106, 112 (1982) ("The theory upon which a case is tried in the lower

court must control in construing the record and determining the validity of [the defendant's] exceptions.").

The majority also errs by concluding that defendant was prejudiced by the trial court's decision to disallow these challenged lines of questioning. I believe that defendant has failed to show prejudice for two main reasons. First, defendant was allowed to ask a myriad of other questions regarding the prospective jurors' opinions of, and experiences with, law enforcement officers. Second, based on the evidence that was introduced at trial, defense counsel's proposed line of questioning about other police shootings was not relevant to his stated rationale for pursuing this line of inquiry—that is, showing defendant's state of mind at the time of the offense, which was the sole purpose offered by defense counsel for his desire to explore this topic.

First, defendant cannot show prejudice because the trial court allowed the parties to ask the prospective jurors a wide variety of other questions regarding their perceptions of the police, the credibility of police officers, and their own personal experiences with the police. In assessing the degree of prejudice a defendant has suffered from a trial court's refusal to allow certain questions on voir dire, a factor that our Court has frequently examined is whether the parties were sufficiently able to elicit the information sought by posing other similar questions to the prospective jurors.

For example, in *Rodriguez*, the defendant contended that the trial court erred by refusing to allow him to ask certain questions about prospective jurors' "ability to

follow the applicable law prohibiting the imposition of the death penalty upon an intellectually disabled person." *Rodriguez*, 371 N.C. at 309. We disagreed, reasoning that although the trial court did limit the defense counsel's questioning in some respects, it also allowed defense counsel to ask a broad range of other questions regarding intellectual disabilities and explain relevant legal topics to the jury. *Id.* at 312–13. Specifically, the trial court had allowed defense counsel to (1) question prospective jurors about "their prior experiences with intellectually disabled individuals," "their familiarity with intelligence testing," and "their willingness to consider expert mental health testimony;" and (2) explain to prospective jurors "that '[m]ental retardation is a defense to the death penalty.' " *Id.* (alteration in original). We concluded that "we do not believe that the limitations that the trial court placed upon the ability of defendant's trial counsel to question prospective jurors concerning intellectual disability issues constituted an abuse of discretion." *Id.* at 313.

Other cases from this Court similarly demonstrate that no matter how important the topic being pursued on voir dire—whether it be racial bias, intellectual disability, or the death penalty—the trial court still "retains discretion as to the form and number of questions on the subject" and may properly use that discretion to allow some, but not all, of counsel's proposed questions. *State v. Robinson*, 330 N.C. 1, 13 (1991) (emphasis added) (quoting *Turner v. Murray*, 476 U.S. 28, 37 (1986)); *see, e.g., Ward*, 354 N.C. at 256 (holding that the defendant could not establish prejudicial error stemming from the trial court's restrictions on certain questions related to the

death penalty, as "defense counsel was allowed to conduct an exhaustive examination into the prospective jurors' attitudes about the death penalty and whether those attitudes would interfere with their ability to serve"); *Robinson*, 330 N.C. at 12–13 (holding that the trial court did not err by restricting certain questions "with respect to jurors' feelings about racial prejudice" because the trial court allowed defense counsel to ask several other probative questions on the issue of racial bias).

Once again, it is crucial to emphasize that although the trial court disallowed defendant's specific request to question prospective jurors about their thoughts on "incidents of cops firing on civilians that happened in the past couple years," the trial court never ruled that defense counsel was barred from asking any questions about race. The fault lies with defense counsel—not the trial court—for failing to pose such questions in an appropriate manner. Moreover, the trial court allowed defendant to thoroughly question prospective jurors regarding their attitudes on issues of police violence, police officers as witnesses, and their prior personal experiences with the police. Indeed, a careful reading of the transcript reveals that the trial court permitted counsel to do the following:

- Explain and define for prospective jurors the concept of "implicit bias against people of a particular race, specifically African Americans."

- Inform prospective jurors that this case involved an exchange of gunfire between defendant and police officers. Defense counsel further stated the following: "[I]f you haven't heard media reports before [about]

-17-

officer-involved shootings, then you haven't been watching any news. They're out there. There is another dynamic that is going on here, too . . . I'll tell you, you can see Mr. Crump is an African-American gentleman, and these officers are white officers, okay? So we're going to be talking about some real issues here this afternoon, because people have some real strong feelings because of media reports but also based on their personal experiences."

- Question prospective jurors regarding their general opinions about police officers, their perceptions of the credibility of police officers, whether their prior interactions with the police were positive or negative, and whether they had any friends or family in law enforcement.

- Inform prospective jurors that police officers are not entitled to any special considerations as to their credibility.

- Ask if the prospective jurors had "any opinions regarding the fact of whether or not a person has a right to self-defense if an officer is the aggressor in the case."

These examples demonstrate that the trial court allowed both the State and defense counsel to thoroughly examine prospective jurors regarding their experiences, attitudes, and perceptions of the police. Accordingly, defendant has failed to show how the information gleaned via this questioning was insufficient to

allow him to uncover any existing biases of prospective jurors and to intelligently exercise his peremptory challenges.

Second, defendant cannot show that he was prejudiced by the trial court's voir dire rulings because—as noted by the Court of Appeals—the information that defendant sought to elicit by asking about unrelated police shootings was not actually relevant to his state-of-mind defenses based on his own testimony at trial. As the above-quoted portion of the transcript makes abundantly clear, defense counsel informed the trial court that he wanted to question prospective jurors about their thoughts on the Ferrell case and police shootings generally because he believed these topics were relevant to the State's claim that defendant fled the scene as well as to defendant's claim of "self-defense . . . as relat[ing] to the assault charges." Defense counsel asserted that concerns about police violence and the recent Ferrell shooting had "directly impacted [defendant's] state of mind . . . at the time of this offense."

However, defendant's own trial testimony reveals that police shootings were not, in fact, on his mind at the time of the incident. To the contrary, defendant's testimony makes clear that he was not actually aware that the persons shooting at him were police officers until after he had already fired shots and fled the scene. Defendant testified that it was not until "after [he] came out onto" N. Tryon Street and saw sirens that he realized "it was the police that [were] shooting at [him]," and it was only during the subsequent car chase that defendant began to think he "might not make it out of this one." Based on this testimony, even the majority concedes that

"[i]t is true that defendant testified that he did not know he was firing at law enforcement officers."

Thus, because defendant did not know he was interacting with police officers at the time he was actually firing the shots in the parking lot, any apprehensions he had about recent police shootings (either as a result of the Ferrell case or otherwise) could not have motivated his allegedly defensive shots or his flight from the scene. Given this admission by defendant during his testimony, the effect of unrelated police shootings on his state of mind simply was not relevant to the issues that the jury had to decide based on the evidence actually presented at trial. Accordingly, defendant cannot demonstrate that he was prejudiced by the trial court's rulings.

Finally, I wish to note my agreement with the majority that the general issue of racial bias would have been a proper subject of inquiry during voir dire in this case. However, for the reasons explained above, defense counsel failed to pursue this topic through appropriate questioning. Had he actually done so, it likely *would* have been an abuse of discretion for the trial court to disallow such questions. But a trial court cannot be found to have abused its discretion during voir dire based on questions that defense counsel did not actually ask or based on rulings that the trial court did not actually render. Accordingly, I respectfully dissent.

Justices NEWBY and MORGAN join in this dissenting opinion.